UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN
_____

In re

HELMINIAK CONFECTIONS OF WISCONSIN, INC.,
f/k/a Quality Candy Shoppes/Buddy Squirrel of Wisconsin, Inc.,

Debtor.
_____

Chapter 11

Case No. 10-20464

ASSET RENEWAL SERVICES, INC., as TRUSTEE for
Helminiak Confections of Wisconsin, Inc.,

                              Plaintiff,

v.

BARDES PLASTICS, INC.,

                              Defendant.

Adv. No. 11-2846

_____

REPORT AND RECOMMENDATION REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

Quality Candy Shoppes/Buddy Squirrel of Wisconsin, Inc., filed for chapter 11 on January 15, 2010. On September 30, 2010, the confirmed plan vested the trustee, Asset Renewal Services, with the right to administer all remaining assets of the debtor, including any funds recovered through preference claims. The trustee commenced this action against Bardes Plastics, Inc., on November 29, 2011, under 11 U.S.C. § 547(b) to recover $19,775.96 in payments made by the debtor in the ninety days before filing bankruptcy. Bardes Plastics moved for summary judgment.

Because the defendant, Bardes Plastics, withheld consent to having the bankruptcy court issue a final order, the following constitutes this Court's proposed findings of facts and conclusions of law

pursuant to Fed. R. Bankr. P. 9033.

BACKGROUND

The debtor manufactured and sold candies and similar confections, and distributed packaged products through retail locations in southern Wisconsin and to wholesale customers throughout the United States. In its operations, it used packaging purchased from Bardes Plastics. For the years 2003 through 2009, Bardes did an average of $262,280.82 in annual business with the debtor. Bardes sent out invoices on the same date as each delivery. Because the seasonal nature of the candy business, the number of debtor's orders placed with Bardes and the size of those orders vastly increased from August through January. While the debtor typically paid its invoices within or close to the 30 days set forth on the invoice in the months of December through July, the debtor frequently required additional time to pay its invoices during the months of August through November. This would logically be the period during which production was up but sales were not. Although the trustee's brief indicated he had not confirmed Bardes' records with actual invoices, Bardes counters that the trustee did not exercise discovery to do so, and the trustee, of course, had access to the debtor's records. Therefore, the Court accepts Bardes' transaction records below as correct.

The following reflects shipments made by Bardes and payments made by the debtor during the preference period:

| Invoice No. | $ Amount | Invoice Date | Payment Date | No. of Days |
|---|---|---|---|---|
| 22413 | 3,714.50 | 08/11/2009 | 10/30/2009 | 80 |
| 22414 | 338.78 | 08/11/2009 | 10/30/2009 | 80 |
| 22422 | 479.25 | 08/18/2009 | 11/06/2009 | 80 |
| 22423 | 742.50 | 08/18/2009 | 11/06/2009 | 80 |
| 22424 | 661.20 | 08/18/2009 | 11/06/2009 | 80 |
| 22439 | 1,797.00 | 08/26/2009 | 11/06/2009 | 72 |

2

| | | | | |
|---|---|---|---|---|
| 22454 | 1,503.00 | 08/31/2009 | 11/06/2009 | 67 |
| 22489 | 866.77 | 09/15/2009 | 11/30/2009 | 76 |
| 22519 | 1,585.98 | 09/22/2009 | 11/30/2009 | 69 |
| 22521 | 6,701.76 | 09/22/2009 | 12/04/2009 | 73 |
| 22530 | 1,109.40 | 09/24/2009 | 12/11/2009 | 78 |
| 22533 | 908.82 | 09/25/2009 | 12/11/2009 | 77 |
| 22540 | 1,351.02 | 09/29/2009 | 12/11/2009 | 73 |
| 22544 | 1,663.80 | 09/29/2009 | 12/11/2009 | 73 |
| 22551 | 837.90 | 09/30/2009 | 12/11/2009 | 72 |
| 22569 | 266.76 | 10/06/2009 | 12/11/2009 | 66 |
| 22572 | 239.97 | 10/06/2009 | 12/11/2009 | 66 |
| 22573 | 104.04 | 10/06/2009 | 12/11/2009 | 66 |
| 22580 | 2,446.30 | 10/07/2009 | 12/18/2009 | 72 |
| 22591 | 2,312.91 | 10/12/2009 | 12/18/2009 | 67 |
| 22593 | 355.68 | 10/13/2009 | 12/18/2009 | 66 |
| 22597 | 4,391.36 | 10/13/2009 | 12/18/2009 | 66 |
| 22604 | 1,166.04 | 10/14/2009 | 12/18/2009 | 65 |
| 22670 | 3,651.23 | 11/05/2009 | 12/18/2009 | 43 |
| 22685 | 2,981.40 | 11/09/2009 | 12/29/2009 | 50 |
| 22688 | 103.68 | 11/10/2009 | 12/29/2009 | 49 |
| 22695 | 1,116.11 | 11/11/2009 | 12/29/2009 | 48 |
| 22697 | 12,479.04 | 11/12/2009 | 12/29/2009 | 47 |
| 22714 | 831.60 | 11/17/2009 | 12/29/2009 | 42 |
| 22715 | 2,946.00 | 11/17/2009 | 12/29/2009 | 42 |
| 22718 | 1,222.50 | 11/18/2009 | 12/30/2009 | 42 |
| 22729 | 698.12 | 11/20/2009 | 12/30/2009 | 40 |
| 22737 | 1,593.90 | 11/24/2009 | 12/30/2009 | 36 |
| 22740 | 3,087.44 | 11/24/2009 | 12/30/2009 | 36 |
| 22742 | 1,393.97 | 11/24/2009 | 12/30/2009 | 36 |
| 22743 | 1,166.04 | 11/24/2009 | 12/30/2009 | 36 |
| 22752 | 1,481.76 | 11/30/2009 | 01/08/2010 | 39 |
| 22759 | 4,422.65 | 12/02/2009 | 01/08/2010 | 37 |
| 22762 | 235.00 | 12/03/2009 | 01/08/2010 | 36 |
| 22768 | 1,115,89 | 12/04/2009 | 01/08/2010 | 35 |
| 22780 | 742.50 | 12/09/2009 | 01/08/2010 | 30 |
| 22787 | 117.50 | 12/09/2009 | 01/08/2010 | 30 |
| 22788 | 705.00 | 12/09/2009 | 01/08/2010 | 30 |

These payments total $76,050.09. In addition, Bardes shipped goods with a total value of $56,274.13 during this same period, and $14,182.80 of that amount remains unpaid, as set forth

3

below:

| Invoice No. | $ Amount | Invoice Date | Payment Date | No. of Days |
|---|---|---|---|---|
| 22800 | 5,527.10 | 12/15/2009 | N/A | N/A |
| 22804 | 323.85 | 12/16/2009 | N/A | N/A |
| 22808 | 1,732.68 | 12/17/2009 | N/A | N/A |
| 22812 | 232.50 | 12/17/2009 | N/A | N/A |
| 22825 | 28.75 | 12/21/2009 | N/A | N/A |
| 22857 | 1,758.12 | 01/11/2010 | N/A | N/A |
| 22860 | 4,579.80 | 01/11/2010 | N/A | N/A |

The number of orders placed by the debtor over the course of the parties' business relationship was as follows:

| | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2003 | N/A | N/A | N/A | N/A | N/A | 7 | 9 | 14 | 19 | 16 | 21 | 28 |
| 2004 | 17 | 7 | 3 | 6 | 7 | 12 | 15 | 11 | 15 | 26 | 29 | 15 |
| 2005 | 15 | 4 | 3 | 5 | 3 | 7 | 7 | 10 | 16 | 21 | 19 | 17 |
| 2006 | 7 | 4 | 5 | 3 | 4 | 2 | 10 | 12 | 22 | 19 | 15 | 11 |
| 2007 | 9 | 8 | 4 | 7 | 2 | 3 | 5 | 7 | 15 | 14 | 11 | 20 |
| 2008 | 10 | 3 | 7 | 2 | 2 | 2 | 5 | 3 | 11 | 7 | 15 | 13 |
| 2009 | 4 | 4 | 3 | 4 | 2 | 1 | 5 | 7 | 8 | 11 | 14 | 11 |

Excluding year 2003 (due to the fact that Bardes purchased the assets of its predecessor in May 2003 and has limited recorded data), over two-thirds to three-fourths of the orders placed every year were between August and January. This would include the entire preference period.

Similar patterns are evident in the number of pieces ordered, with an average range of 69.72% to 80.01% of pieces ordered annually occurring between August and January in years 2004 through 2009:

| | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

4

|      | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|------|------|-----|------|-----|-----|-----|
| 2003 | N/A | N/A | N/A | N/A | N/A | 34,114 | 62,578 | 102,336 | 208,847 | 95,570 | 93,304 | 115,891 |
| 2004 | 69,173 | 30,375 | 11,138 | 16,783 | 43,161 | 50,505 | 46,138 | 56,621 | 102,104 | 169,606 | 132,718 | 92,289 |
| 2005 | 76,090 | 35,752 | 14,182 | 40,518 | 6,171 | 36,849 | 21,052 | 60,546 | 165,103 | 168,323 | 82,044 | 70,019 |
| 2006 | 47,543 | 13,240 | 16,016 | 10,742 | 23,832 | 6,358 | 65,112 | 69,733 | 176,841 | 153,500 | 83,776 | 37,785 |
| 2007 | 46,620 | 61,464 | 7,974 | 38,462 | 6,930 | 12,823 | 26,179 | 53,860 | 147,493 | 86,621 | 86,201 | 194,968 |
| 2008 | 81,408 | 6,930 | 30,562 | 9,255 | 7,305 | 6,075 | 15,326 | 7,993 | 56,792 | 92,276 | 64,310 | 28,974 |
| 2009 | 33,665 | 50,110 | 11,560 | 14,385 | 10,550 | 2,100 | 26,824 | 31,814 | 33,067 | 47,251 | 85,102 | 35,079 |

The same seasonal variation occurred in Bardes' historical volume of sales with the debtor, as well:

|      | Jan $ | Feb $ | Mar $ | Apr $ | May $ | June $ | July $ | Aug $ | Sept $ | Oct $ | Nov $ | Dec $ |
|------|-------|-------|-------|-------|-------|--------|--------|-------|--------|-------|-------|-------|
| 2003 | 28,957.86 | 13,601.54 | 14,637.75 | 6,637.89 | 18,802.00 | 9,901.18 | 25,299.08 | 38,338.24 | 74,809.19 | 38,552.47 | 41,701.93 | 39,682.15 |
| 2004 | 30,510.31 | 11,417.04 | 4,282.89 | 6,790.75 | 16,848.33 | 28,807.26 | 13,654.10 | 18,577.47 | 34,335.19 | 53,156.29 | 53,801.90 | 37,797.66 |
| 2005 | 28,558.28 | 8,541.07 | 6,553.29 | 16,701.08 | 3,298.03 | 12,893.50 | 8,746.76 | 20,730.80 | 69,521.74 | 59,336.13 | 41,137.77 | 25,409.47 |
| 2006 | 23,723.76 | 5,543.97 | 7,862.63 | 4,957.70 | 9,567.64 | 3,722.22 | 24,216.83 | 25,869.33 | 77,695.53 | 54,289.50 | 38,285.80 | 15,481.06 |
| 2007 | 22,764.38 | 18,490.53 | 2,844.25 | 19,399.53 | 3,947.19 | 4,218.29 | 10,912.30 | 22,156.91 | 36,338.79 | 44,092.12 | 38,470.93 | 42,560.38 |
| 2008 | 25,635.04 | 3,622.02 | 10,740.95 | 4,472.13 | 3,692.40 | 2,897.55 | 6,316.78 | 3,903.27 | 23,694.99 | 33,624.99 | 31,327.61 | 13,375.96 |
| 2009 | 18,160.24 | 13,959.48 | 5,025.30 | 3,620.67 | 4,966.20 | 961.80 | 11,640.32 | 9,236.32 | 15,025.45 | 20,390.50 | 34,752.79 | 15,183.42 |

Perhaps most significant in this preference analysis, the average number of days from the dates of Bardes' invoices to the dates of payments from the debtor, on a monthly basis, varied as follows:

|      | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|------|------|-----|------|-----|-----|-----|
| 2003 | N/A | N/A | N/A | N/A | N/A | 56.86 | 95.33 | 100.93 | 86.68 | 73.75 | 44.90 | 67.68 |
| 2004 | 67.76 | 50.29 | 33.33 | 32.83 | 15.86 | 41.42 | 11.47 | 12.27 | 41.27 | 58.35 | 42.41 | 23.47 |
| 2005 | 14.47 | 12.25 | 10.00 | 12.00 | 11.67 | 20.57 | 67.00 | 89.10 | 94.75 | 71.10 | 45.89 | 19.00 |
| 2006 | 9.86 | 12.25 | 14.60 | 11.00 | 12.50 | 11.00 | 10.80 | 48.00 | 67.50 | 57.26 | 30.27 | 12.64 |
| 2007 | 9.44 | 11.63 | 13.25 | 15.71 | 9.00 | 9.67 | 7.80 | 10.00 | 59.40 | 61.14 | 41.82 | 19.65 |
| 2008 | 11.50 | 12.00 | 10.43 | 8.00 | 14.00 | 10.50 | 11.40 | 20.00 | 58.91 | 55.71 | 40.73 | 13.69 |

Likewise, the range of days from date of invoice to date of payment during that same historical

5

time period was as follows:

|      | Jan High | Jan Low | Feb High | Feb Low | Mar High | Mar Low | Apr High | Apr Low | May High | May Low | June High | June Low |
|------|----------|---------|----------|---------|----------|---------|----------|---------|----------|---------|-----------|----------|
| 2003 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 63 | 49 |
| 2004 | 79 | 52 | 63 | 41 | 35 | 30 | 44 | 11 | 17 | 15 | 102 | 2 |
| 2005 | 22 | 5 | 13 | 11 | 11 | 9 | 13 | 10 | 13 | 9 | 62 | 8 |
| 2006 | 11 | 9 | 16 | 10 | 18 | 13 | 14 | 7 | 14 | 11 | 12 | 10 |
| 2007 | 13 | 7 | 15 | 5 | 14 | 12 | 28 | 10 | 9 | 9 | 11 | 7 |
| 2008 | 16 | 8 | 16 | 6 | 13 | 7 | 8 | 8 | 14 | 14 | 14 | 7 |

|      | July High | July Low | Aug High | Aug Low | Sept High | Sept Low | Oct High | Oct Low | Nov High | Nov Low | Dec High | Dec Low |
|------|-----------|----------|----------|---------|-----------|----------|----------|---------|----------|---------|----------|---------|
| 2003 | 110 | 62 | 110 | 97 | 92 | 80 | 87 | 62 | 53 | 34 | 78 | 56 |
| 2004 | 17 | 7 | 15 | 9 | 55 | 19 | 68 | 10 | 54 | 31 | 34 | 10 |
| 2005 | 72 | 64 | 97 | 70 | 102 | 88 | 77 | 57 | 56 | 37 | 32 | 7 |
| 2006 | 15 | 8 | 60 | 6 | 77 | 48 | 69 | 48 | 52 | 9 | 17 | 9 |
| 2007 | 9 | 6 | 16 | 7 | 73 | 12 | 71 | 51 | 55 | 35 | 70 | 8 |
| 2008 | 15 | 9 | 40 | 10 | 68 | 49 | 63 | 45 | 44 | 35 | 21 | 7 |

As may be seen from the above payment history, the parties' business relationship was long-standing and continuous, right up until the debtor filed its bankruptcy petition. During the ninety days before the debtor filed for bankruptcy, the debtor paid its invoices to Bardes anywhere within 80 to 30 days from the invoice date, with the delay between invoice and payment shortening as the petition date drew ever closer.

## ARGUMENTS

In support of its motion for summary judgment, the defendant, Bardes Plastics, asserts two defenses to the plan trustee's preference allegations: (1) the ordinary course of business defense under 11 U.S.C. § 547(c)(4) and (2) the new value defense under 11 U.S.C. § 547(c)(2). Applying the ordinary course of business defense on a seasonal basis, the range of payments between invoice and payment from September through December 2009 fell within the ordinary course of the parties'

6

business.  *See In re Moltech Power Sys., Inc.*, 327 B.R. 675, 681 (Bankr. N.D. Fla. 2005).  During the years 2003 through 2008, the average number of days past invoice annually increased during the months of August through November, with September usually being the largest.  Twenty-one of the 36 payments related to invoices during the preference period were made within a few days of the seasonal average.  *See In re Julien Co.*, 157 B.R. 834, 841-42 (Bankr. W.D. Tenn. 1993).  Additionally, during the preference period, of the $76,050.09 in total transfers, Bardes provided to the debtor $56,274.13 in new value in the form of additional plastic packaging.  Of that amount, $14,182.80 remains unpaid, which would absorb any amount of what could remain of the plaintiff's alleged preferential transfer claim.

      The trustee argues, due to the lack of a complete record of all of the invoices prior to 2009, including the debtor's own business records, it is unable to verify the preference summaries provided by Bardes.  All of the payments were made more than 30 days after the invoice dates, with an average of 65.18 days between invoice and payment.  The average number of days for the months of August through October for 2003 to 2008 was 59.23 days.  And excluding 2003, the average number of days between the date of the invoice and the date of payment was 53.65 days.  During the preference period, the debtor was under financial distress because it was subject to a forbearance agreement from its lender and its access to its line of credit was severely restricted.  Thus, an issue of fact exists as to whether or not the delayed payments during the preference period were in the ordinary course of business or were not as a result of any concession made by Bardes, but rather were the result of the deteriorating financial relationship between the debtor and its lender.  Furthermore, according to the trustee, Bardes has already been given credit for the new value in the trustee's recovery request, less

7

than $20,000, making that defense meritless.

## DISCUSSION

Summary judgment is appropriate when the movant shows that "there is no genuine issue as to any material facts and ... the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986). The primary purpose of summary judgment is to avoid trial where there is no genuine issue of material fact in dispute. *See Trautvetter v. Quick*, 916 F.2d 1140, 1147 (7th Cir. 1990). The Court will drawing all inferences in favor of the nonmoving party. *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 839 (7th Cir. 2011).

As an initial matter, the elements of an avoidable preference are: 1) a transfer of property of the debtor; 2) within 90 days of bankruptcy; 3) to or for the benefit of a creditor; 4) on account of an antecedent debt; 5) while the debtor is insolvent; and 6) with the effect of giving the creditor a greater return on its claim than would have been received in a chapter 7 proceeding if the transfer had not been made. *In re Jarosz*, 322 B.R. 662, 670 (Bankr. E.D. Wis. 2005). While the elements of a preference have been conceded, Bardes asserted two defenses under section 547(c): contemporaneous exchanges for new value given to the debtor, and payments of debts incurred by the debtor in the ordinary course of business. 11 U.S.C. § 547(c)(1)-(2). The exceptions set forth in section 547(c) are affirmative defenses, and the creditor against whom recovery or avoidance is sought has the burden of proving that the transfers meet a condition making them nonavoidable. 11 U.S.C. § 547(g).

While the movant, Bardes, did not provide the Court with copies of all of its invoices, it did provide an affidavit from its president, Michael Heyer, in support of the parties' invoice and payment

8

history summaries. A party may rely on an affidavit at summary judgment if it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 & n. 2 (7th Cir. 2011). Bardes' exhibits, which contained detailed summaries of the preferential and earlier payments, were based upon Mr. Heyer's personal knowledge and are appropriate for this Court's consideration. The trustee does not dispute Mr. Heyer's numbers; it only alleges it cannot confirm them, and the defendant would need to have the invoices to have the evidence admitted at trial. The creditor points out that the originals were not demanded in discovery, and the debtor has records of the parties' business history of its own. The Court accepts Bardes' exhibits as true.

*Ordinary Course of Business Defense.*

Bardes Plastics argues that all payments from the debtor, paid within 90 days of the petition, were made in the "ordinary course of business" and are therefore, unavoidable under section 547(c)(2). To establish that payment was made in the "ordinary course of business," Bardes must establish that either the payment: (A) was "made in the ordinary course of business or financial affairs of the debtor and the transferee;" or (B) was "made according to ordinary business terms." 11 U.S.C. § 547(c)(2). When analyzing whether payments fall within section 547(c)(2), the court must look at the established practices of the parties' business relationship. *See Matter of Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032 (7th Cir. 1993). Whether a payment was made in the "ordinary course of business" depends on the length of time the parties were engaged in the transaction at issue; whether the amount or form of tender differed from past practices; whether the debtor or creditor engaged in unusual

9

collection or payment activity; and whether the creditor took advantage of the debtor's financial distress. *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642 (7th Cir. 2003). Late payments are considered within the "ordinary course of business" if the terms of the parties' business agreement was modified prior to the preference period. *Matter of Xonics Imaging Inc.*, 837 F.2d 763, 766 (7th Cir. 1988). When analyzing the transactions, courts frequently look to the creditor's billing cycle and pay close attention to the past payment history. *See, e.g., Tolona Pizza*, 3 F.3d at 1033.

One aspect of the ordinary course defense is whether the parties changed their payment or collection practices during the preference period. Even if some of the transfers may have been later or earlier than usual during the pre-preference period, the preferential transfers may still be considered ordinary, provided there has not been a change in previous practices. *See, e.g., In re Speco Corp.*, 218 B.R. 390 (Bankr. S.D. Ohio 1998) (payments two to four days beyond the usual range of lateness and which were not the result of improper actions were within the exception). In its brief, the trustee alluded to problems between the debtor and its bank during that period that might have affected the debtor's ability to pay, and this creates a question of fact. However, there are no allegations that Bardes took any unusual action regarding shipments, altered its terms, or sought earlier payment. Additionally, the trustee acknowledges that the debtor's records reflect no demands or pressure for payment by the creditor, nor are there allegations that the debtor requested concessions from the creditor. So the creditor took no actions that would subject payment of its invoices to avoidance.

Bardes asserts it had no knowledge of any problem involving the debtor's bank, and there is no competing allegation that it did. According to the affidavit of Samuel Hope III, the former CFO of the debtor, the debtor's loan matured in the fall of 2009, but the debtor and the bank entered into a

10

forbearance agreement. Business was up after Halloween, and it is not explained how the bank's relationship with the debtor somehow adversely affected the debtor's ability to make payments to Bardes. Indeed, the time between invoice and payment actually grew closer through the fall and toward the end of the preference period, with the last three payments being made in 30 days, the term stated on the invoices, just as it had in earlier years. Therefore, the allegation that the debtor's banking relationship caused preferences to be out of the ordinary course is insufficient to give rise to a factual dispute, especially since there appears to have been no effect. The Court does not consider bank problems, payment pressure, collection practices, or creditor concessions as issues that affected the outcome. This leaves us with only the raw data to consider.

As noted by the movant, seasonal variations in the debtor's business cycle may be considered when establishing the parties' ordinary course of business. *See In re Moltech Power Sys., Inc.*, 327 B.R. 675 (Bankr. N.D. Fla. 2005) (recognizing straight averages of invoice to payment dates may not take into account seasonal variations and may inaccurately depict actual ordinary course of business); *In re Decor Noel Corp.*, 134 B.R. 875 (W.D. Tenn. 1991) (considering payment in ordinary course given seasonal, Christmastime, nature of debtor's business). The fact that the debtor's business experienced seasonal variations has not been contested by the trustee.

Because of the long-term business relationship in this case, we have an established ordinary course of business between the parties. Late payments during the preference period were clearly not outside of the ordinary course of business because paying late was historically part of the ordinary course of business that developed between the parties before the preference period. *See In re Narragansett Clothing Co.*, 146 B.R. 609 (Bankr. D. R.I. 1992) (late payments were not outside of

11

the parties' normal practice so were within scope of exception); *In re Perks*, 134 B.R. 627 (Bankr. S.D. Ohio 1991) (late payments, including late charges, within scope of exception insofar as debtor historically had made such payments). Most of the cases analyzing the ordinary course defense pay close attention to the number of days between invoice and payment, and both sides in this case have presented plentiful charts and mathematical comparisons.

Certainly, a swing of 80 days at the beginning of the period to 30 days at the end warrants scrutiny. But the history of the parties shows the span between invoice and payment varied even more over the years of their doing business, ranging from 110 days in July and August 2003 to 2 days in June of 2004. Nit-picking out to two decimal points of a percentage simply is not helpful when the swings are this enormous. What is clear from the six and one half years we have records for is that the parties consistently did regular business with other, and this did not change during the 90 days before the debtor filed its chapter 11 case. In the past, the volume of orders fluctuated substantially during each year, and payment delays fluctuated just as substantially. The purpose of preference recovery in bankruptcy, and the defenses thereto, is to discourage aggressive collection practices as the debtor experiences financial difficulties and to encourage continuing, fair, and ordinary business relationships up to the time of filing. *Barnhill v. Johnson*, 503 U.S. 393, 402, 112 S.Ct. 1386 (1992). That is what happened here. The defendant/creditor has met its burden of proof, and all payments during the preference period were made in the ordinary course of business and are not subject to avoidance.

*Contemporaneous Exchanges for New Value Defense.*

Bardes Plastics further argues the payments made are nonavoidable under the "new value" defense. The new value defense under section 547(c)(4) provides that a trustee may not avoid a

12

transfer:

> [T]o or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor –
> (A) not secured by otherwise unavoidable security interest; and
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C. § 547(c)(4).

This exception is premised on the theory that "to the extent unsecured new value is given to the debtor after a preferential transfer is made, the preference is repaid to the bankruptcy estate." *Matter of Prescott*, 805 F.2d 719, 727 (7th Cir. 1986). Creditors are no worse off on account of the preferential transfer because value comes back into the estate for distribution to general creditors. *See In re Schabel*, 338 B.R. 376, 380 (Bankr. E.D. Wis. 2005). Congress intended section 547(c)(4) to encourage creditors to continue doing business with troubled debtors by protecting transfers received by creditors from preference actions, to the extent that the creditors provided goods that replenished the estate during the preference period. *In re Armstrong*, 291 F.3d 517, 525 (8th Cir. 2002).

A creditor establishes that "new value" was given if: (1) after receiving a preferential transfer, the creditor advanced additional credit to the debtor on an unsecured basis and (2) the additional post-preference unsecured credit was unpaid in whole or in part as of the date of the bankruptcy petition. *See In re Globe Bldg. Materials, Inc.*, 484 F.3d 946, 949 (7th Cir. 2007). If a creditor establishes that it gave "new value" in exchange for the preferential transfer, then it may offset the value exchanged by the amount of new value paid. "New value" is measured at the time the debtor takes possession of the transferred goods. *Id*. at 951.

As stated above, the debtor and the creditor continued to do business as usual during the

13

preference period, with the debtor ordering product, the creditor shipping on unsecured credit, and the debtor paying invoices as it had in prior years, with the usual delay shortening as Christmas neared. In 2009, the amount shipped was slightly less than the invoices paid during the preference period, but except for 2007, this was typical. The creditor also met its burden of proof on the new value defense, to the extent it was unpaid for shipped product after payment of

what would otherwise be a preference.

*Conclusion*

The creditor has met its burden of proof with respect to all payments having been made by the debtor in the ordinary course of business during the 90 days prior to filing. The creditor has also met its burden of proof with respect to having provided new value after payment of invoices during the same period. This Court recommends granting the defendant's motion for summary judgment and dismissal of the adversary proceeding.

October 17, 2012

                                                      Margaret Dee McGarity
                                                     United States Bankruptcy Judge